Flora L. CHAMPION, Individually and as Independent Executrix of the Estate of Frank Champion, deceased, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18937.

United States Court of Appeals
Fifth Circuit.

June 11, 1962.

888

Dougal C. Pope, Charles Crady, III, Houston, Tex., for petitioner.

R. P. Hertzog, Acting Chief Counsel, I. R. S., Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.

JONES, Circuit Judge.

The Commissioner of Internal Revenue determined income tax deficiencies of Frank Champion and Flora L. Champion for the year 1951 in the amount of $3,-358.94, and for the year 1952 in the amount of $177,096.56. The Tax Court agreed with the Commissioner's determination, and its decision and order is before us for review. The transactions from which the asserted tax deficiency arose were those of Frank Champion, who was a party in the proceeding in the Tax Court which is before us for review. He has died and Flora L. Champion, his widow, has qualified as Independent Executrix of his estate. In her representative capacity, she has been substituted for her husband as a petitioner in these proceedings. She is a petitioner in her individual capacity because of the filing of a joint income tax return.

Texas-Ohio Gas Company was a Delaware corporation organized in May, 1951, with an authorized capital stock of 600,000 shares of the par value of 50 cents a share. It was promoted by Clyde Austin. As an incident to its qualification to do business in Texas, Austin made a deposit for the account of the corporation in a Houston bank of a check drawn by Austin upon a bank in which the drawer's balance was less than the amount of the check. The check was credited as full payment for all of the authorized capital stock. The corporation was promptly qualified, and Austin promptly transferred the corporate bank account to his own. The capital stock was issued to "Clyde Austin, Trustee," in two certificates, No. 1 for 380,000 shares and No. 2 for 220,000 shares. Whether a trust was intended is not apparent from the record. The corporation was organized for the purpose of building a gas pipe line and transporting gas from Mexico to Ohio. Apparently some contracts, whether tentative or final is uncertain, were made with owners of gas properties and others, but these seem unimportant for the purposes of the reaching of a solution to the problems presented.

On July 17, 1951, Champion and Texas-Ohio entered into a contract which was in the form of a letter from the company to him. The agreement provided that Champion should "receive for services rendered and to be rendered [as manager of the company] fifteen per cent. (15%) of the capital stock of Texas-Ohio Gas Corporation and the right to purchase an additional ten per cent. (10%) at the opening price when placed upon the market by the Investment Bankers, simultaneously to when issuance of all the stock represented by the various interests will be issued and made of record." The agreement also provided that an Executive Committee would be appointed and "all stock involved in this transaction will be placed in a voting trust under which the Executive Committee will have the authority to operate." No voting trust was ever set up. It was recited that a detailed agreement would be drafted in

the near future. No such agreement was ever prepared.

On July 27, 1951, a meeting of the Board of Directors of Texas-Ohio was held. At the meeting Austin reported that Certificate No. 1 for 380,000 shares should be reissued to Clyde Austin and Frank Champion, Trustees, "to be held by them for future developments, to their own benefit and the benefit of others who contributed to the organizational development of the company as their several interests might appear, such being the agreement with Mr. Champion." On the day of the meeting Certificate No. 1 was cancelled and reissued as Certificate No. 3 to "Clyde Austin and Frank Champion, Trustees." At the meeting Austin stated that 59,999 shares out of Certificate No. 2 should be issued to J. Leslie Witt and Earl E. Beyer, Trustees, and the balance of that Certificate in the amount of 160,001 shares should be held subject to the future order of Champion and Austin. The Board approved Mr. Austin's action in the matter. Certificate No. 2 was surrendered to the company.

An investment banking firm negotiated for and purchased 50,000 shares of Texas-Ohio stock from Austin and Champion at 50¢ per share and 50,000 shares from the company at $2.00 per share, with an option to buy 100,000 additional shares at $2.00 per share. The option was exercised. The 50,000 shares were issued out of Certificate No. 3, and Certificate No. 10 for 330,000 shares was reissued to Austin and Champion, Trustees. Champion received $11,225 from this deal. At the direction of Austin and Champion the 160,001 shares were to be used to meet the commitment to the bankers and for such other purposes as the Board of Directors might determine upon. The investment bankers held 200,000 shares at a cost of $325,000. In April of 1952, Champion bought 5,000 shares of Texas-Ohio stock from the company for 50¢ per share which was delivered to him out of the shares supposedly represented by the 220,000-share Certificate turned in by Austin. A few days later Champion sold this 5,000 shares to Harold F. Wood

for $6.50 per share resulting in a profit to him of $30,000. Austin made a similar sale. Of the proceeds of the sale made by Champion the sum of $27,500 was placed in a separate bank account "for the welfare of the company." In May of 1952, Champion received $15,000 from Austin for which Champion was to deliver 3,000 shares of Texas-Ohio stock to a purchaser, then undisclosed, at such time as the company should receive a permit from the Federal Power Commission. No permit was received.

Soon after, probably in June of 1952, the discovery was made that when Austin went through the motions of making payment of $300,000 for the 600,000 shares of the capital stock of the company he had used a worthless check. The investment bankers, finding they had bought into a hollow shell, made demands upon the company and upon Champion. On June 18, 1952, Champion was required by the bankers to place the $27,500 in the company's regular bank account. Champion was required to agree that no action would be taken to recognize claims with respect to the 330,000 shares which had previously been held by Champion and Austin "for future development to their own benefit and the benefit of others." It was required that the 330,000 shares be put in the names of others. The minutes of a meeting of the Board of Directors of Texas-Ohio held on August 5, 1952, recite that Champion called attention to the "agreement under which he was to receive 90,000 shares of the stock of the company," and stated that "it had become necessary to make a readjustment of provisions for distribution of the stock under circumstances which developed after he had given upward of a year of full time service to the company." A motion was then adopted "that 50,000 shares of the original stock of the company be confirmed in Mr. Champion as of the date of his original agreement with the company, that is to say July/7 [sic], 1951, upon condition that Mr. Champion make no further claim to stock based upon said agreement, and that said issue of 50,000 shares of stock

to him be in full consideration for one year of his service to the company, said year to be considered as having been completed on the first day of July, 1952; it being further provided that Mr. Champion, at his own option, might consider the sale of certain stock of the company to Harold F. Wood, from the proceeds of which sale Mr. Champion has held in abeyance to the credit of the company the sum of $27,500, as a sale from said allocation of 50,000 shares of stock to him, and upon that condition might withdraw from the company said sum of $27,500; it also being provided that this allocation of stock be not in prejudice of any option which may at any time be extended to Mr. Champion for the further purchase of stock of the company." Champion received the $27,500. Two days later a certificate for 65,000 shares was issued to Champion, of which 20,000 was earmarked for others. On September 15, 1952, pursuant to an option, Champion purchased 10,000 shares from the company at $1.00 per share.

In the Federal income tax return of Frank Champion and Flora L. Champion, his wife, for 1951, a profit of $11,225 on the sale of Texas-Ohio stock was reported as a short-term capital gain. In their 1952 return, long-term capital gains were reported of 10,000 shares of Texas-Ohio acquired "7–1951," at a cost of $2,500 and sold "4–52" for $32,500, showing a gain of $30,000, and of 3,000 shares of Texas-Ohio acquired "7–1951," at a cost of $15,000 and sold "5–52" for $30,000, showing a gain of $15,000. The return showed no tax payable. The Commissioner asserted a tax deficiency for 1951 of $3,358.94, which for the most part, resulted from the inclusion of $11,225 as compensation from Texas-Ohio taxable as ordinary income, and the disallowance of $6,237.46 which had been claimed as a deduction for travel and entertainment. For 1952 the Commissioner's proposed deficiency included an item of $251,750 as compensation from Texas-Ohio and a travel and entertainment deduction of $9,817.64, was disallowed. The Commissioner concluded that the $11,225 received

by Champion from the sale reputedly made by Austin and himself in 1951 was compensation for services and as such was taxable as ordinary income. The Commissioner held that the $30,000 profit on the stock sold to Wood and the $15,000 received from Austin on the unconsummated sale of 3,000 shares were also compensation for services and taxable to the extent of the profit in the Wood deal and in the amount received in the other deal. The Commissioner deducted the 5,000- and 3,000-share lots which Champion had sold or agreed to sell, from the confirmed 50,000 shares, and set up 42,000 shares as delivered to Champion as of August 7, 1952, and valued it at $4.00 per share as of that day and for this item set up $168,000 as compensation to Champion. The Commissioner valued the 10,000 shares which Champion bought in September, 1952, at $4.875 per share and treated as compensation the difference between that valuation, or $48,750, and the $10,000 which Champion paid for the stock.

■ The initial and most important question is whether Champion acquired 90,000 shares of Texas-Ohio in July, 1951. At the outset we may inquire as to whether or not he could have acquired the stock in that year. The Constitution of the State of Delaware, the state of incorporation, provides that corporations shall not issue stock except for money paid, labor done, personal property, real estate or leases actually acquired. Del.Const. Art. IX, Sec. 3. The Texas Constitution has a similar provision. Tex.Const. Art. 12, Sec. 6, Vernon's Ann.St. Because of the sameness of the two constitutional provisions and of the decisions of the courts of Delaware and Texas construing their constitutional provisions, we do not reach the question of which law would govern. Cf. 1 Moore, Federal Practice 3764, Par. 0.325; Joy v. Godchaux, 8th Cir., 1929, 35 F.2d 649, cert. den. 281 U.S. 723, 50 S.Ct. 239, 74 L.Ed. 1141; Hamilton-Turner Grocery Co. v. Hander, Tex.Civ. App., 253 S.W. 833; Triplex Shoe Co. v. Rice & Hutchins, 17 Del.Ch. 356, 152 A.

342, 72 A.L.R. 934. The giving of a check for stock where the maker has insufficient funds for the payment of the check does not constitute a payment of money. 11 Fletcher Cyclopedia of Corporations 561, § 5194. Hence, there was no valid issue of stock to Austin at the time he received Certificates numbered 1 and 2.

■ If we look to the agreement with Champion for fifteen per cent of the stock as the consideration of an original issue of the corporate stock, we are met with the same constitutional provisions. Where it is provided that stock can be issued only for labor done, as in Texas and Delaware, the requirement is not met where the consideration for the stock is work or services to be performed in the future. 11 Fletcher, Cyclopedia of Corporations 536–537, § 5187; Triplex Shoe Co. v. Rice & Hutchins, supra. Cf. Hackney v. York, Tex.Civ.App., 18 S.W.2d 923. The rule is now codified under the Texas statutes. 3 A Vernon's Ann.Tex.Rev. Civ.Stat. 81, Art. 2.16, subd. B. The situation is not changed by reason of the provision that the stock was to be given to Champion for services rendered as well as to be rendered since there was no allocation or apportionment of stock between services performed and services to be performed. Triplex Shoe Co. v. Rice & Hutchins, supra. It does not appear that Champion had rendered any substantial service to the corporation, if indeed he had rendered any, at the time the contract was made with him. There was not any valid original stock issue to Austin because he made no payment for it. Hence it cannot be said that Champion received any stock by the surrender of a certificate by Austin and its reissue to Austin and Champion, as Trustees. Nor, for the reasons stated, was there an original issue from the corporation to Champion at the time of the contract. It follows that Champion received no stock pursuant to the contract until, in 1952, the 50,000 shares were "confirmed" in him. It follows that there was no error in the Tax Court's determination that in 1952 Champion acquired 50,000 shares

of Texas-Ohio stock for services to the corporation. The Tax Court, in reaching its decision, applied the well-settled rule that stock received as compensation for services rendered to the issuing corporation is taxable as ordinary income of an amount equal to the value of the stock at the date of issuance. So also, as to the stock acquired by the exercise of the stock purchase option, the Tax Court invoked the principle that taxable income as compensation for services is determined at the time the option is exercised and the stock is acquired, and is measured by the difference between the fair market value and the option price. Commissioner v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142; Commissioner v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830.

■ The 25,000 shares of stock which Champion sold to the investment bankers in December of 1951 were invalid as having been issued without consideration. Austin had not paid for it. Champion's contract did not then entitle him to it. The subsequent confirming of stock in Champion made no reference to these 25,000 shares. The investment bankers, by the arrangement subsequently made, were regarded as having made actual payment for all of the 600,000 shares of the authorized capital stock of the company at the par value of 50 cents per share. This treated the $300,000 paid to the company for 150,000 shares of the invalidly issued stock as having been the consideration for all of the shares. In addition to the recognition of an obligation to Champion and the confirming of 50,000 shares in him, it was provided by the arrangement that all parties mutually acquitted all other parties of all claims growing out of stock transactions. This, it would seem, was an implied recognition and ratification of Champion's right to receive and sell the 25,000 shares in 1951. There was no consideration given by Champion for the stock other than services to the corporation. The amount of the realization was properly treated as ordinary income to Champion in 1951 as

was held by the Commissioner and the Tax Court.

The principles stated are controlling as to the sale of 5,000 shares of Texas-Ohio stock by Champion to Wood in April, 1952, and the 3,000-share deal with Austin in May, 1952, in which Champion received $15,000. It is our conclusion that the Tax Court correctly treated these transactions.

 We are unable to agree with the Commissioner and the Tax Court in their method of ascertaining the value to be given to the 42,000 shares acquired by Champion for services, and the 10,000 shares purchased by him for $1.00 per share pursuant to the exercise of an option. The finding of the Tax Court and its summary of the evidence upon which it relied, are found in the following excerpt from its findings:

"Crockett & Company, a partnership in Houston, Texas, dealing in over-the-counter market of unlisted securities, hereinafter called Crockett, dealt in transactions with Texas-Ohio stock during the year 1952. In making a market in Texas-Ohio stock, Crockett maintained a firm bid and firm offering price. During February, March, and April of 1952, Crockett engaged in sales of Texas-Ohio stock at prices in excess of $6 per share. For the period from April 24 to August 28, the price fluctuated between $4 and $6 a share with the single exception of August 8 when 100 shares were acquired by Crockett at $3.75 a share. From August 28 to September 8, the price fluctuated between $3 and $4 a share, but on the latter date rose to $6.25 a share. From September 8 through November 5, the price fluctuated between $4 and $6 a share. On August 7, 1952, no sales of stock were listed by Crockett. On August 4, 1952, Crockett purchased 500 shares of Texas-Ohio at $4 a share and sold those shares at $4.25 a share on the same day. On August 8, Crockett purchased 100 shares of Texas-Ohio at $3.75 a share and sold them on the same day at $4.25 a share. Also on August 8, 1952, Crockett purchased 200 shares of Texas-Ohio at $4 a share and sold them on the same day at $4.25 a share. On August 11, Crockett purchased 3,800 shares of Texas-Ohio stock from Clyde Austin at $4.75 a share and sold 3,700 shares to various individuals on that day at $5 per share.

"On September 15, 1952, when petitioner acquired 10,000 additional shares of Texas-Ohio at $1 per share, the records of Crockett show a purchase and sale of 1,000 shares at $5.125 a share, and the purchase of an additional 1,100 shares at $5.25 a share, and one purchase of 250 shares at $4.50 per share. During September 1952, Glenn Davidson, a certified public accountant and secretary of Texas-Ohio, purchased 4,000 shares of Texas-Ohio at $5 per share."

The recital might have continued by saying that in November of 1952 the market collapsed and Crockett was buying Texas-Ohio stock at 1½ and selling at 2 and 2¼. Between August 1, 1952, and August 7, 1952, the date on which Champion received the 42,000 block of stock, Crockett made a single sale of 500 shares. Between August 7 and the end of the month Crockett listed sales of 9,600 shares. The market was "made" by Crockett, and was an extremely thin market. The Crockett record of sales and purchases of Texas-Ohio stock, introduced by the Commissioner before the Tax Court extends from February 29, 1952, to November 27, 1952, a period of nine months. During this interval a lesser number of shares were sold than the 42,000 shares which Champion acquired in August of that year. Only two sales in excess of 1,000 shares are listed.

The monetary measure of the income upon which the tax is computed is the fair market value of the stock. There is no distinction, for most purposes and none for the purpose of this decision, in the meaning of fair market value as used in an estate tax case and one involving

income tax. 10 Mertens Law of Federal Income Tax § 59.01 N. 3. In determining the fair market value of the shares of unlisted stock the method most frequently employed is by reference to other sales of the same stock at approximately the time as of which the valuation is to be made. In the absence of exceptional circumstances, the price at which sales of stock are made in arms-length transactions in an open market is the best evidence of its value. In order that other sales shall be determinative of fair market value, such sales must have been made in a fair market. If the purchases and sales of Crockett in the market which it made were supported or stimulated so as not to be truly representative, the prices at which such sales were made would not be determinative of the fair market value.

It is hardly to be supposed that Champion's two blocks of stock, one for 42,000 shares and the other for 10,000 shares, could have been disposed of on the dates he received them at the prices which Crockett was making while trading in a comparatively few shares from time to time. Indeed, it seems probable that if Champion, the president and general manager of Texas-Ohio, had offered at one time a number of shares considerably in excess of all that Crockett had handled during a nine months' period, the price drop would have come much quicker than it did. In some situations the so-called blockage rule of valuation of a large number of shares has taken into consideration the possibility of sales over a period of time by dealers, brokers or underwriters. In the case of du Pont v. Commissioner, 2 T.C. 246, the Tax Court valued a block of du Pont stock by discounting the market prices over a period of ninety days subsequent to the valuation date. In 104 days after Champion received the 42,000 shares and 66 days after he purchased 10,000 shares, Crockett was buying at 1½ and selling at 2 and 2¼.

It is our conclusion that the "made" market of Crockett for the comparatively few shares of Texas-Ohio stock which were traded does not establish a fair market value for the large blocks of stock which were acquired by Champion. We do not overlook the Tax Court's statement that Champion failed to produce evidence to carry his burden in overcoming the Commissioner's finding of value. However, we think it appears that the method of determining value was incorrect in that no consideration was given to the fact that the stock to be valued was of large blocks held by the president-general manager of the issuing company. In such a case it seems proper that there should be a remand for further consideration. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

In order that further evidence may be received and further consideration given to the question of stock valuation, the decision of the Tax Court is

Reversed and remanded.