**UNITED STATES of America,**
**Plaintiff,**

v.

**Leon I. ROSS, Ross & Company, Limited and Central Trading, Inc., Defendants.**

United States District Court
S. D. New York.
Feb. 25, 1966.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for plaintiff, Harvey R. Blau and Irwin B. Robins, Asst. U. S. Attys., of counsel.

Farber, Cohen & Diamond, New York City, for defendants, Frank R. Cohen, New York City, of counsel.

LEVET, District Judge.

This is a tax foreclosure action in which the United States seeks a judgment against the defendant Leon I. Ross in the sum of $227,310.57 tax and penalties of $70,579.93 for the year 1956; $207,827.95 tax and $68,167.57 penalties for the year 1957; $1,085,416.75 tax and $54,270.84 penalties for the year 1958; and $50,547.47 tax and $2,527.57 penalties for the year 1959 plus interest. Assessments involving alleged liability for foreign personal holding company taxes in the above amounts [1] having been timely made against the defendant Leon I. Ross and he having failed to pay the same, this action was commenced seeking to reduce the above assessments to judgment and foreclose the same against any property or rights to property which the taxpayer may have.

## THE ISSUES

The assessments here involve the status of Ross & Co., Ltd. and Central Trading, Inc. as foreign personal holding companies under Section 552 of the Internal Revenue Code of 1954 and the consequent liability of Leon I. Ross for their undistributed foreign personal holding company income under Section 551(a) (1) of the 1954 Code in the taxable years 1956–1959. The only question in this case is whether Ross & Co. and Central Trading meet the gross income requirements for foreign personal holding companies in the relevant years.[2] Int. Rev. Code of 1954, §§ 552(a) (1), 555(b). The parties have stipulated the issues to be determined by this court. For the years 1956, 1957, and 1958, the issue is whether Central Trading was a foreign personal holding company in those years, and that issue turns on two subordinate issues:

First, was Central Trading a dealer in the stock of Venezuelan Leaseholds, Inc. (hereinafter sometimes "INC") within the meaning of Section 553(a) (2) of the 1954 Code so that gains realized on the sale or exchange of that stock during 1956–1958 are not foreign personal holding company income?

Second, did Central Trading receive Venezuelan Leaseholds, Inc. stock in 1956 and 1958 for work, labor and services rendered so that its value on receipt is ordinary income of the "active" type which is not foreign personal holding company income?

The defendants' position is that one of the above questions must be answered in the affirmative, while the government contends that neither theory is supportable.

For the year 1959, the determinative issue is whether Ross & Co. was a foreign personal holding company, and that issue turns on the answer to the question:

Did Ross & Co. earn $56,484.38 interest income from Central Trading in 1959?

If it did, Ross & Co. was a foreign personal holding company in that year.

After hearing testimony of the parties, examining the exhibits, the pleadings, the briefs and proposed findings of fact and conclusions of law submitted by counsel,

1. By stipulation of the parties, the assessment for 1957 was reduced from $227,310.57 tax and $74,557.87 penalties to the above figures of $207,827.95 tax and $68,167.57 penalties.

2. On the basis of Findings of Fact 1–3, infra, it is apparent and undisputed that Ross & Co. and Central Trading meet the ownership requirements for foreign personal holding companies. They are foreign corporations in which at all times during the taxable years in question, 1956–1959, more than 50% of their outstanding stock was owned directly or indirectly by five or fewer (here one) individuals who are United States citizens. Int.Rev.Code of 1954, §§ 552(a) (2), 554.

this court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

### A. THE PARTIES

1. Defendant Leon I. Ross is an American citizen who resided in the Bahamas during the years 1953 through 1959.

2. Defendant Ross & Co. is a Bahamian corporation, organized by Mr. Ross for the purpose of acting as a broker and dealer in securities and for the purpose of managing companies. All the stock of Ross & Co. was owned during the years 1956 through 1959 by defendant Ross, who served during that period as its chief executive officer.

3. Central Trading is a Liberian corporation, organized on March 31, 1956. All of its corporate shares have at all times been owned by Ross & Co.

### B. THE BUSINESS RELATIONS OF CENTRAL TRADING AND ROSS & CO.

4. Central Trading was a client of Ross & Co., and traded securities through Ross & Co. for which it was charged commissions. Central Trading also had a management agreement with Ross & Co. under which it paid management fees to Ross & Co. and was charged interest by Ross & Co. for loans made to it.

5. Ross & Co. as a resident of the Bahamas was subject to the regulations of the Sterling Exchange Control and could not deal in non-Sterling securities without permission. Central Trading, as a Liberian corporation, however, was a non-resident of the Bahamas and could deal in non-Sterling securities without permission of the Exchange Control.

6. During the applicable years, Central Trading had no office, no telephone listing, no mail box listing, was not registered with or known to the Exchange Control, was not known to the security-buying public nor, in fact, to anyone except the employees of Ross & Co.

### C. THE VENEZUELAN OIL DEAL

*(a) Its inception and the interests of Mr. Ross, Ross & Co., and Central Trading*

7. In March 1956, Mr. Ross met one Steven Van Gelder who advised Ross that he might be able to arrange certain deals in Venezuela through political connections. Later that month, Ross went to Venezuela and learned that the government was about to solicit bids for oil concessions to be awarded for exploitation.

8. Van Gelder, Ross, and certain Venezuelans then arranged for the formation of Venezuelan Leaseholds C.A. (hereinafter "CA"), a Venezuelan corporation which was to bid for the oil concessions.

9. CA was organized on March 5, 1956 with an authorized capital of 15,000 shares at 100 Bs (Bolivares) a share, that is, 1,500,000 Bs (approximately $450,-000). CA's Articles of Incorporation recite that the entire 15,000 share capitalization had been subscribed for by seven individuals of which one was Mr. Ross who took 9,000 shares. There is no recital of any shares being given for services rendered.

10. Venezuelan law requires a minimum of 20% of a corporation's capital to be paid in at the time of formation. To meet this requirement, Ross & Co. through an arrangement with the Banco Provincial of Venezuela provided some $90,090.00 which was placed in the bank and credited to CA's account for a short time after which it was removed by Ross & Co.

The books and records of CA showed $90,090.00 owing to CA from Ross & Co. in lieu of cash in that amount.

11. The books and records of Ross & Co. showed Ross & Co. owing $90,090.00 to CA and also showed Central Trading owing $90,090.00 to Ross & Co. for the purchase by Central Trading of all the 15,000 outstanding shares of CA. Thus, it appears that Central Trading, and not the subscribers mentioned in Finding of Fact 9, purchased the outstanding stock of CA.

12. On or about May 14, 1956, Venezuelan Leaseholds, Inc. was organized by Mr. Ross with an authorized capital of 10 million bearer shares at $1.00 par value.

13. On May 14, 1956, an exchange of 4,950,000 INC shares for the 15,000 shares of CA in Central Trading's possession took place and is reflected on the books of Ross & Co. This action was approved by the board of directors and shareholders of both Central Trading and INC.

Central Trading also subscribed to 30,000 INC shares at $1.00 par value per share.

After the above transactions, Central Trading owned 4,980,000 shares of INC stock for which it owed $90,090.00 to CA and $30,000 to INC, and INC owned all of the 15,000 shares of CA.

14. I find the testimony to the effect that Central Trading held INC shares merely as nominee for a group of Venezuelans unconvincing and unsupported by the records of Ross & Co.

15. The exchange of the CA stock for the INC stock occurred before CA had even filed an application for the oil concessions and before it had even conditionally received an award for those concessions.

16. On July 13, 1956, CA filed an application with the Venezuelan Government for oil concessions. On August 22, 1956, CA was officially advised that they were conditionally awarded these concessions. The condition was that 4.6 million dollars had to be paid to the Venezuelan Government on or before September 5, 1956. A two-week extension in supplying the money was later obtained by CA.

*(b) Finding an investor*

17. In August of 1956, Mr. Ross contacted one Mr. Kernan of White Weld & Company seeking financing for CA to enable them to buy the oil concessions. Mr. Kernan contacted San Jacinto Oil Company who sent one Mr. Kilgore and others to Venezuela to look into the oil concessions conditionally awarded to CA.

18. It appears that Kilgore did not trust Mr. Ross and would not allow San Jacinto to become involved with CA as long as Ross, through Ross & Co. and Central Trading, which owned the INC bearer stock, was in control of INC and CA. Kilgore then told the Venezuelans that San Jacinto would not put up the money for the oil concessions unless it was clear that neither Ross nor Van Gelder had control of either INC or CA.

The Venezuelans, then, to protect the concessions from default, requested Mr. Ross to come to Venezuela and pressured him into turning over his INC stock (that held by Central Trading) to them so that San Jacinto would agree to pay. This was accomplished on September 1 and 4, 1956, when Central Trading transferred 2,245,000 INC shares to Mr. Brandt, one of the Venezuelans. No payment was made for the transfer, and there was no change of ownership or title to the stock. Furthermore, in a letter to one John Carden on June 23, 1958, Mr. Ross referred to these 2,245,000 shares as "my own shares."

19. Subsequent to the aforesaid stock being transferred by Central Trading to Brandt, San Jacinto entered into an agreement dated September 19, 1956 with CA which provided that San Jacinto was to get title to the oil concessions and CA was to receive a guaranty of 50% of the net profits to be derived from the exploitation. San Jacinto was also to pay for the oil concessions and to guaranty to provide capital to be used in their exploitation.

*c. Further dealings with San Jacinto*

20. In early 1957 San Jacinto started negotiations with CA to buy the 50% net profits interest in the oil concessions. On July 1, 1957, there was an agreement entered into between CA and San Jacinto to the effect that CA was to receive 250,000 shares of San Jacinto stock in exchange for its 50% net profits interest.

*d. Other transactions in INC stock during 1956–1958*

21. Subsequent to the exchange of CA stock for INC stock, Mr. Ross on behalf of Central Trading delivered 2 million

INC stock to Steven Van Gelder on May 14, 1956. On these 2 million shares, Van Gelder was to deliver 1,900,000 to certain Venezuelans who were to arrange·for the oil concessions; these shares were not turned over to the Venezuelans. The other 100,000 shares were delivered to LaSarte & LaSarte, Venezuelan stock brokers, who had agreed to buy 250,000 shares of INC stock from Central Trading at $1.00 a share less 2% commission.

22. In 1958, Central Trading got back 540,000 shares of INC stock from the Venezuelans divided as follows: 440,000 went to Central Trading and 100,000 went to Carden and one Oaks as nominees for Central Trading. These 540,000 shares were part of the 2,425,000 shares Central Trading had transferred to the Venezuelans under pressure in September of 1956 and were all Ross could get back from them. See Finding of Fact 18.

23. In August of 1958 and thereafter there was an exchange of 200,000 shares of San Jacinto stock by CA for the 5 million outstanding shares of INC. The remaining 50,000 shares of the San Jacinto stock were used by CA to pay their taxes and expenses.

## D. FINDINGS WITH RESPECT TO CENTRAL TRADING'S STATUS AS A DEALER IN THE YEARS 1956–1958.

### a. 1956

24. In the period May to August, 1956, as reflected in the records of Ross & Co., Central Trading sold 250,000 shares to LaSarte & LaSarte who, in turn, sold them to its customers. LaSarte was neither a customer of Central Trading nor of Ross & Co.; rather, it was a Venezuelan firm which was a dealer in and made a market in INC stock in Caracas, Venezuela.

25. Another 25,000 were sold on May 18, 1956 at 1¢ a share, but were in effect given for services rendered to a broker for introducing the Ross group to Star Falcon Oil Co., a prospective investor.

26. On August 29 and September 1, 1956, Central Trading sold 25,000 shares of INC stock to one Govantes, a Cuban politician. In addition, Central Trading sold 15,700 shares of INC stock through Ross & Co. during the May to September, 1956 period. During the same period, Central Trading and/or Ross & Co. purchased no INC stock.

27. During the period May to September, 1956, approximately 800,000 shares of INC stock were traded in Caracas by LaSarte & LaSarte.

28. Before San Jacinto committed itself to the deal, Central Trading was only selling INC stock. Once San Jacinto became committed in September 1956, Central Trading immediately purchased 20,000 INC shares and sold only 350 shares in the remainder of 1956.

29. On the basis of Findings of Fact 24–28, I find that in 1956 Central Trading was not a dealer in INC stock since its buying and selling pattern indicates speculation and investing in INC stock and not making a market or acting as a specialist in that stock.

### b. 1957

30. From January to April, 1957, on some eleven occasions, Central Trading sold a total of 15,100 shares to Ross & Co. customers. On May 10, 1957, 32,500 shares were sold to Ross & Co., but not one to its customers. After May 10, 1957, neither Central Trading nor Ross & Co. ever again sold one share of INC stock.

31. The cessation of selling noted in Finding of Fact 30 coincides with the commencement by San Jacinto, after May 1957, of negotiations to purchase the remaining 50% net profit interest of CA. See Finding of Fact 20.

32. In a letter of March 9, 1957 by Mr. Ross of Ross & Co. to John Fountain of White Weld & Company, Mr. Ross stated:

"For your information I have no intention of selling any of my shares for these prices since I believe the odds favor a good producing well."

33. I find that in 1957 Central Trading was not a dealer in INC stock since its buying and selling pattern demonstrates that it was a speculator and an investor and not making a market or acting as a specialist in INC stock.

*c. 1958*

34. With respect to the year 1958, neither Central Trading nor Ross & Co. ever sold one share of the INC stock and only bought the same.

35. In 1958, Central Trading was not a dealer in INC stock, since no activity as a specialist, buying and selling, is shown.

E. FINDINGS WITH RESPECT TO WORK, LABOR, AND SERVICES BY CENTRAL TRADING IN 1956 AND 1958.

36. I find that the alleged oral agreements testified to by Mr. Ross, to the effect that Central Trading and/or Ross & Co. were to receive 1 million shares of INC stock for services rendered in obtaining an investor, unsupported and contrary to the exhibits.

37. I find Mr. Ross not worthy of belief on this point.

38. Central Trading never received any INC stock for work, labor, or services rendered.

F. FINDINGS WITH RESPECT TO THE INTEREST INCOME OF ROSS & CO. IN 1959.

39. The records of Ross & Co. indicate that in 1959 it charged Central Trading interest of $58,132.40 on its daily balances owed to Ross & Co.

40. Ross & Co. borrowed money in 1959 from Morgan Guaranty Corp. and Watt & Watt. The interest charges were $56,240.93.

41. I find that Mr. Ross' testimony, that Ross & Co. acted as a mere conduit in arranging financing with Morgan Guaranty Corp. and Watt & Watt for purchases by Central Trading of dollar securities, unsubstantiated in the record.

42. The interest paid by Ross & Co. and that charged by Ross & Co. to Central Trading were separate and distinct.

## DISCUSSION

The government seeks here to reduce to judgment certain jeopardy tax assessments. By putting the assessments in evidence, the government established a prima facie case and shifted the burden to the taxpayer to prove that the assessments are erroneous. United States v. Lease, 346 F.2d 696 (2nd Cir. 1965).

In determining the issues in this case, the taxpayer would have the court disregard the existence of Central Trading or at least treat it as an agent of Ross & Co. for tax purposes. It is clear, however, that Central Trading was a separate corporation, a client of Ross & Co., and could deal in non-Sterling securities without the permission of the Exchange Control—a thing Ross & Co. could not do. As such, Central Trading had a substantial business function which precludes any attempt to ignore it by piercing the corporate veil for tax purposes. Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); Commissioner of Internal Revenue v. State-Adams Corp., 283 F.2d 395 (2nd Cir. 1960). Neither can the claim that Central Trading was an agent of Ross & Co. be sustained since there is no proof to support it. National Carbide Corp. v. Commissioner of Internal Revenue, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); Moline Properties, Inc. v. Commissioner of Internal Revenue, supra. Even though Ross & Co. held all the stock of Central Trading, the latter corporation had an independent existence, and its management agreement with Ross & Co. in no way appears to establish a principal-agent relationship between the two. Rather, Ross & Co. was to serve under the agreement as an investment adviser and manager for Central Trading. Frank v. Commissioner of Internal Revenue, 321 F.2d 143 (8th Cir. 1963), relied upon by the taxpayer, is distinguishable, for the facts there allowed an inference that an agency existed. To make such an inference here would be to disregard both the management agreement between Ross & Co. and Central Trading and the inten-

182

tional isolation of the two companies made necessary by the Bahamian Exchange Control Laws.

## I. CENTRAL TRADING AS A DEALER IN INC STOCK IN THE YEARS 1956–1958.

■ For the definition of a dealer within the meaning of Section 553(a) (2) of the 1954 Code, Regulation 1.555 refers to the Regulations under Section 543 for the pertinent definitions. Regulation 1.-543–1(b) (5) (ii) states:

"* * * The term 'regular dealer in stocks or securities' means a corporation with an established place of business regularly engaged in the purchase of stock or securities and their resale to customers. However such corporations shall not be considered as regular dealers with respect to stock or securities which are held for investment. * * *"

A dealer is, thus, a specialist who is rewarded for his labors as a middleman for bringing buyers and sellers together, George R. Kemon, 16 T.C. 1026 (1951), and who is to be distinguished from the speculator or investor purchasing securities in expectation of a rise in the market price, Helvering v. Fried, 299 U.S. 175, 57 S.Ct. 150, 81 L.Ed. 104 (1936), Schafer v. Helvering, 299 U.S. 171, 57 S.Ct. 148, 81 L.Ed. 101 (1936). Furthermore, it is clear that a corporation may be a dealer as to some securities and an investor as to others. Vaughan v. Commissioner of Internal Revenue, 85 F.2d 497 (2nd Cir. 1936).

■■ The facts here, in my opinion, demonstrate that Central Trading was not a dealer in INC stock in the relevant years. They show, contrary to the definition of "dealer" in the Regulations, that Central Trading had no established place of business, that it was unknown to purchasers and sellers of securities, and that it was not known even to the Exchange Control which controlled and licensed dealers in securities. Furthermore, the testimony is clear that Central Trading had no customers by itself, but, rather, sold stock through Ross & Co. who, in

turn, sold it to its customers. Such activity does not make Central Trading by itself a dealer. The taxpayer, however, would have the court impute the alleged dealer status of Ross & Co. to Central Trading. This imputation is improper because Central Trading had an independent business function, Moline Properties, Inc. v. Commissioner of Internal Revenue, supra. Even if the court were to consider Central Trading and Ross & Co. together, dealer status would not be shown by the evidence in this case.

Examination of the transactions in INC stock on the records of Ross & Co. for its client, Central Trading, reveals a pattern indicative of an investor or speculator rather than of a dealer. Between May 18, 1956 and September 1, 1956, Central Trading sold some 40,700 shares of INC stock to Ross & Co. customers and sold under an option agreement another 250,000 shares to LaSarte and LaSarte, Venezuelan stockbrokers who in fact traded some 800,000 shares of INC stock in the same period. 25,000 shares went to another person in effect for services rendered. From September, 1956, when San Jacinto committed itself to put up the money for the oil concessions, until the end of 1956, Central Trading sold only 350 shares and bought 20,000. This activity is not that of a dealer maintaining a market in a stock and holding himself out as a buyer and seller to anyone at all times. Rather, it savors of investment and speculative advantage.

In the first four months of 1957, Central Trading sold only 15,100 shares of INC stock to Ross customers (32,500 shares were sold to Ross & Co. in May, 1957) and after May, 1957 not a single share of INC was sold by Central Trading for the rest of 1957 or in the year 1958. Furthermore, the record shows that in March, 1957, the taxpayer, Leon Ross, wrote a letter in which he said that Ross & Co. had no intention of selling any INC stock at least until a producing oil well came in. Also, it appears that Central Trading began purchasing stock in the middle of 1957 in expectation of a purchase by San Jacinto of the remaining

50% net profit interest in CA and an exchange of San Jacinto stock for INC stock which in fact occurred in 1958. Again the actions are those of an investor and not a dealer. In light of Ross & Co.'s records and the close association of Leon Ross with the oil deal, Mr. Ross' testimony that Central Trading was making a market in INC stock and that Ross & Co. quoted bid and asked prices for INC stock in the 1956–1958 period is unpersuasive and does not overcome what I believe is convincing proof that Central Trading held INC stock as an investor in the relevant years.

## II. CENTRAL TRADING'S RECEIPT OF STOCK FOR SERVICES

 Similarly, I find no satisfactory proof to substantiate the taxpayer's alternate theory that Central Trading received INC stock in the relevant period for services rendered. There is no doubt that stock can be received as compensation, Champion v. Commissioner of Internal Revenue, 303 F.2d 887 (5th Cir. 1962) and that such income in this case would not be foreign personal holding company income under Section 553. The business records of Ross & Co., however, do not disclose receipt of stock for services rendered. Rather, they show 15,000 shares of CA purchased by Central Trading on May 5, 1956 for $90,090.09 and an exchange on May 14, 1956 of 15,000 shares of CA for 4,950,000 shares of INC.

Mr. Ross, nonetheless, would have the court ignore his records and accept as true certain oral agreements to which he testified and which he alleges indicate that INC stock was received for services rendered in the relevant period. Mr. Ross would have the court believe that he held INC shares merely as a nominee for a Venezuelan group which was to give him 1,000,000 INC shares for his services. Nowhere are there documents to prove such a relationship. Mr. Ross as the taxpayer in this case was an interested witness. In numerous instances there were substantial inconsistencies in his testimony. Furthermore, on cross-examination Mr. Ross admitted that he was

forced to transfer 2,425,000 INC shares to Brandt in September, 1956 to save the deal, the very shares which he referred to as "my own shares" in a letter to John Carden. In light of the foregoing, I find that the taxpayer has failed to prove by a fair preponderance of the evidence that INC stock was received for work, labor, and services rendered in the relevant period. Accordingly, I hold that Central Trading was a foreign personal holding company in 1956, 1957, and 1958.

## III. ROSS & CO.'S INTEREST INCOME IN 1959

For the year 1959, the question is whether Ross & Co. was a foreign personal holding company and more specifically whether Ross & Co. earned $56,-484.38 as interest income in that year. The taxpayer's claim is that Ross & Co. earned no interest income and served merely as a conduit by which Central Trading paid interest on loans from Morgan Guaranty Corp. and Watt & Watt.

 The record clearly shows (1) that Ross & Co. in 1959 was charged interest in the amount of $56,240.93 on loans secured by securities of its clients from Morgan Guaranty Corp. and Watt & Watt, and (2) that Ross & Co. in 1959 charged interest in the amount of $58,-132.40 on the daily balances owed it by Central Trading. The record, however, shows no relationship between the payments, aside from similarity of amount, unless I am to believe Mr. Ross' testimony that Ross & Co. borrowed from Morgan Guaranty and Watt & Watt in order to finance Central Trading's purchases of dollar securities. Were the taxpayer able to show that the loans from Morgan Guaranty Corp. and Watt & Watt and the loans from Ross & Co. to Central Trading were one and the same, interest paid to Ross & Co. and then forwarded to Ross & Co.'s lenders would not be income to Ross & Co., even if Ross & Co. charged a fee for the service. Cf. Bettendorf v. Commissioner of Internal Revenue, 49 F.2d 173 (8th Cir. 1931); Fellows Sales Co. v. United States, 200 F.Supp. 347 (D.S.D.

1961). But the record here shows no satisfactory proof to substantiate Mr. Ross' self-serving testimony; rather, it shows distinct and separate charges by Ross & Co.'s lenders to it and by Ross & Co. to its borrowers. Accordingly, I am forced to conclude that the defendants have failed to prove that Ross & Co. did not earn $56,484.38 as interest income from Central Trading in 1959 and that Ross & Co. was a foreign personal holding company in 1959.

## IV. SUMMARY

From the foregoing discussion, is it apparent that the crucial and determining factor in the present case, as I view it, is the credibility of the defendant, Leon I. Ross, and, more particularly, the extent to which Mr. Ross may be allowed to vary the records of his wholly-owned corporation, Ross & Co., solely by means of his own oral testimony. Of course, there cannot be a flat rule that corporate records may not be altered by oral testimony. Exhibits and oral testimony by their intrinsic nature are not always different in probative force; they are merely different types of evidence which must be considered together in determining what the facts are. But where inconsistencies exist in a witness' testimony and where his demeanor on the stand is such that his credibility is open to question, there is little reason for according truthfulness to any oral attempt to impeach his own records. In my view, Mr. Ross falls within the category of witnesses whose credibility is open to serious question. Accordingly, in determining the facts in this case, I have given greater weight to the records of Ross & Co. than to Mr. Ross' oral testimony, which at times differed substantially from and was inconsistent with those records.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§ 7401, 7402(a) and 7403.

2. Pursuant to the stipulation of issues entered into by the parties dated December 22, 1965, this court holds that the defendants have failed to prove that Ross & Co. and/or Central Trading were exempt from foreign personal holding company tax on the sale or exchange of INC stock in the years 1956 through 1958 on the ground that together or separately they were regular dealers in securities within the meaning of Section 553(a) (2) of the Internal Revenue Code of 1954.

3. The defendants have failed to prove that the INC stock was received by Central Trading for work, labor and services rendered in 1956 or 1958.

4. With respect to the year 1959, the defendants have failed to prove that the interest income attributed to Ross & Co. in the tax assessment for that year as earned from Central Trading was in fact not interest income.

5. Judgment must, therefore, be entered in favor of the United States upon the complaint as amended by the stipulation of the parties (see fn. 1, supra) for $1,571,102.74 tax and $195,545.91 penalties with costs and interest, as allowable by law.

Settle judgment on notice.