FELLOWS SALES COMPANY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Fred Y. FELLOWS and Robena Fellows, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Charles I. FELLOWS and Frances Fellows, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Vaughn G. FELLOWS and Helen Fellows, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Max J. FELLOWS and Edith Fellows, Plaintiffs,

v.

W. C. WELSH, District Director of Internal Revenue, Defendant.

Civ. Nos. 1260–1264 S.D.

United States District Court
D. South Dakota, S. D.

Dec. 21, 1961.

H. L. Fuller (of Woods, Fuller, Shultz & Smith), Sioux Falls, S. D., for plaintiffs.

Stephen H. Anderson, Dept. of Justice, Washington, D. C., for defendants (Harold C. Doyle, U. S. Dist. Atty. for the Dist. of South Dakota, Sioux Falls, S. D., on the brief).

MICKELSON, Chief Judge.

Pursuant to the order of this Court, these cases were consolidated for trial.

These actions were brought for a refund of certain federal income taxes for the years 1955, 1956 and 1957, which have been paid under protest by the plaintiffs.

Trial was had before the Court sitting without a jury, and from the testimony adduced, the pleadings, exhibits, and a stipulation of the parties, the following facts were established:

In 1919, Fred Y. Fellows, Sr., became a member of a partnership engaged in the lumber-brokerage business in Sioux Falls, South Dakota. In 1923, Mr. Fellows, Sr., purchased his partner's interest in the business and operated the same as a sole proprietorship from that time until his sudden death on March 27, 1941.

Preceding his death, Mr. Fellows, Sr., had enlisted the assistance in the business of his four sons. None of the four sons actually owned any interest in the business, but all served in various capacities, primarily as salesmen.

By the nature of the lumber-brokerage business in which the Fellows family was thus engaged, no lumber was actually carried as stock, but carload lot orders were solicited from lumber yards, etc., and then filled through lumber mills with which Mr. Fellows, Sr., had established contacts. The assets of the business at the time of the death of Mr. Fellows, Sr., consisted of office furniture and fixtures, some 38 or 40 unfilled carload lot orders for lumber, and goodwill.

Mr. Fellows, Sr., died testate, and by the terms of his will, the business passed to his wife, Mrs. Gertrude K. Fellows, whom he also named as executrix. The will also provided:

"I further express a sincere wish that the business in which I have been engaged for many years, and in which I have been ably assisted by members of my family, be continued by my sons and that they annually pay to my beloved wife during her natural life, out of the proceeds of the business a sum equal to five per cent of the gross earnings."

A few days following the death of Mr. Fellows, Sr., and soon after his will had been read to his family, Mrs. Fellows and her four sons had numerous conversations concerning the continuance of the business by the sons. As a result of these discussions, it was agreed among them that the four sons would take over the operation of the business, and that Mrs. Fellows would receive 5% of the gross receipts, all in accord with the wish which Mr. Fellows, Sr., had expressed in his will.

Within one week after their father's death, the sons entered into a partnership agreement and began to manage the business formerly carried on by their father. About two weeks later, the sons executed and delivered to their mother the following instrument:

"April 14, 1941
"We (Max J. Fellows, Fred Y. Fellows, Jr., Charles I. Fellows Vaughan G. Fellows) the undersigned operating the Co-Partnership under the name of 'Fellows Sales Company' do hereby agree to pay annually to our Mother, Gertrude K. Fellows, the sum of 5% of the gross income earnings of the business received each fiscal year. Payment to Gertrude K. Fellows to be made at the end of each fiscal year.
"Fellows Sales Company
"(signed:)
"Max J. Fellows
"F. Y. Fellows, Jr.
"Chas. I. Fellows
"Vaughan G. Fellows"

During the course of the administration of the estate of Mr. Fellows, Sr., and on or about November 24, 1941, Mrs. Fellows, as executrix of said estate, sold to the four sons the furniture and fixtures of the business for the sum of $1000.00.

The business was operated as a partnership by the four sons until August 1, 1947, at which time it was incorporated with the four sons as sole stockholders, each owning an equal amount of stock.

Both the partnership and the corporation have at all times since the death of Mr. Fellows, Sr., set aside for the benefit of Mrs. Fellows 5% of the gross receipts of the business, and such amount has always been credited to her account monthly on the books of the business, either under the heading "Commissions Paid" or "Drawing Account." While Mrs. Fellows' 5% share of the gross receipts of the business was deposited in the company's bank account and was not specifically earmarked as funds belonging to her, it appears that this was done to relieve Mrs. Fellows of the full responsibility for the management of her financial affairs. She relied upon her sons to assist her in paying out of her share of these gross receipts many items of her personal expenses, which they did. The balance of her share of the gross receipts remained temporarily in the company's bank account until such time as she requested that all or any part of it be transferred to her own bank account. Mrs. Fellows has received her 5% share of the gross earnings of the business in the manner above outlined even in years in which the business suffered net losses.

During the years that the business operated as a partnership, the amounts thus set aside to Mrs. Fellows were included in the gross income on the partnership tax return, and deducted under the heading "Commissions Paid." Likewise, since the business has been operated as a corporation, the amounts set

aside to Mrs. Fellows were included in the gross income on the corporate tax return and deducted under the heading "Salaries and Wages (not deducted elsewhere)." Mrs. Fellows has always included her 5%· share of the gross earnings of the business in her personal income tax return and has paid the tax thereon.

The Government takes the view that this 5% set aside to Mrs. Fellows during the years before the Court should be taxed as income to the corporation, and therefore as constructive dividends to the four sons as stockholders, and that the same in reality constituted voluntary payments by the sons to their mother out of their own income. Consistent with this view, the Commissioner has assessed additional taxes and interest against the plaintiffs—the corporation, the four sons of Mrs. Fellows and their wives—for the years 1955, 1956 and 1957, totaling $10,782.02.

Claims for refund were timely filed by the plaintiffs, setting forth the claims asserted in these suits, and statutory notices of disallowances of these claims were issued.

The issue before the Court is whether the amounts set aside to Mrs. Fellows by the corporation constituted income to her only, or whether it may be taxed as income first to the corporation, and then as constructive dividends to the sons as stockholders, as well as to Mrs. Fellows.

 Gross income is " * * * all income from whatever source derived * * *." 26 U.S.C.A. § 61(a). To be taxable, income must be " * * * . actually and substantially derived * * *." Bettendorf v. Commissioner of Internal Revenue, 8 Cir., 1931, 49 F.2d 173, 175, and the concept of "gain" or "profit" is implicit in the term. Eisner v. Macomber, 252 U.S. 189, 193, 40 S.Ct. 189, 64 L.Ed. 521 (1920). In this case, if Mrs. Fellows reserved to herself an interest in the business represented by 5% of the gross receipts therefrom, and if the corporation merely acts as trus-

tee in collecting those receipts for her benefit, the corporation, and hence its stockholders, have not received "income" within the meaning of 26 U.S.C.A.· § 61(a). Cf., Bettendorf v. Commissioner of Internal Revenue, supra; Central Life Assur. Soc. Mut. v. Commissioner of Internal Revenue, 8 Cir., 1931, 51 F. 2d 939; Shellabarger v. Commissioner of Internal Revenue, 7 Cir., 1930, 38 F. 2d 566. On the other hand, if Mrs. Fellows' sons have simply assigned to her income to which they, the sons, are rightfully entitled, such assignment would not operate to prevent constructive receipt of that income both by the corporation and by the sons as stockholders, and each would be taxable thereon. Cf., Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Burnet v. Leininger, 285 U.S. 136, 52 S.Ct. 345, 76 L. Ed. 665 (1932); Van Meter v. Commissioner of Internal Revenue, 8 Cir., 1932, 61 F.2d 817.

 It therefore becomes necessary for us to examine with great care all the evidence concerning the relationship which was established between Mrs. Fellows and her sons in the sons' capacity as partners, and later, as stockholders in the corporation.

It is undisputed that Mr. Fellows, Sr., owned the business as sole proprietor and that the business passed to Mrs. Fellows at his death. Likewise, there is no dispute that within a few days after the death of Mr. Fellows, Sr., his four sons began to operate the business as partners. The crucial consideration, then, relates to the contract or agreement which was entered into in the interim and which resulted in the transfer of all or part of the business to the sons. In determining the tax consequences of this transfer, we are obliged to rely heavily upon the testimony of Mrs. Fellows and her four sons, and the reasonable inferences to be drawn therefrom, and upon the acts of the parties in carrying out the agreement which we undertake to interpret.

Both Mrs. Fellows and Fred Y. Fellows, Jr., testified that the agreement

which was reached between Mrs. Fellows and her four sons contemplated the payment of the 5% to Mrs. Fellows as a "reservation" by her of an interest in the business which she had inherited. Two of Mrs. Fellows' sons, Max and Charles, were less explicit in their testimony, but both recalled that during the discussions among the members of the family immediately following the death of Mr. Fellows, Sr., it was stated and agreed that Mrs. Fellows "was entitled" to 5% of the gross receipts. Mrs. Fellows and all four of the sons positively testified that the receipt by Mrs. Fellows of the 5% was one of the terms of the agreement by which the sons took over the business. The testimony and the exhibits clearly show that the sons, either in their capacity as partners, or in their capacity as stockholders and directors of the corporation, have never failed to honor their agreement, and that they have always withheld 5% of the gross receipts for the benefit of their mother, even in years when the business suffered net losses. All the parties to the transaction with which we are concerned have always treated the 5% in question as belonging to Mrs. Fellows, and, until the Commissioner's ruling was made known, no one had ever questioned, expressly or by implication, the absolute right of Mrs. Fellows to the 5%. Neither in their capacities as partners, nor in their capacities as stockholders and directors of the corporation, have the sons ever exercised any control over the 5% belonging to their mother, except such control as was necessary to collect these receipts and pay them to her or at her direction. There is no substantial evidence that Mrs. Fellows relinquished more than 95% of the gross receipts of the business to her sons, which business was admittedly 100% hers, and therefore we cannot escape the conclusion that the income which she has received and continues to receive from the business comes to her by virtue of an interest which she reserved to herself at the time she transferred the remainder of the business to

her sons. The facts which we have recited would be inconsistent with any other view. The Government produced no witnesses to the agreement between Mrs. Fellows and her sons, and their testimony concerning the nature of that agreement stands uncontradicted.

The Goverment's position that the payments to Mrs. Fellows were made by her sons as voluntary contributions out of their own income does not square with the facts, as we shall illustrate.

First, the Government contends that there could have been no reservation by Mrs. Fellows of an interest in her deceased husband's business, because there was no business for her to inherit from her husband. As we have previously noted, the nature of this lumber-brokerage business did not require the maintenance of a stock of merchandise. However, the value of 22 years' goodwill, the excellent mill connections, and the 38 or 40 unfilled orders for carload lots of lumber cannot be denied. These assets, intangible though they may have been, were of no little value, and they became the property of Mrs. Fellows by the terms of her husband's will, and were transferred from Mrs. Fellows to her sons.

Second, the Government advances the theory that no interest in the business was retained by Mrs. Fellows because the testimony showed that she did not make the 5% payments a prerequisite to the transfer of the business, that is, that she did not insist on that exact arrangement. It must be conceded that Mrs. Fellows did not deal at "arm's length" with her sons, but we fail to see how that fact alters the binding arrangement which they made and have at all times carried out. Granted, Mrs. Fellows could have made an outright gift to her sons of the entire business, but the evidence shows that she did not, and whether the reservation of the 5% by Mrs. Fellows resulted from "arm's length" bargaining or through amiable discussions makes not the slightest difference.

Third, the Government points out that there is no written contract by which Mrs. Fellows transferred the business to her sons and reserved an interest therein, and that the instrument of April 14, 1941, supra, does not state that the 5% payments were to be made because of a reservation of such interest by Mrs. Fellows. But the existence of a contract is not precluded by the absence of a writing, and the fact that the parties did not set forth in detail the legal intricacies of their relationship does not extinguish the relationship which already had been created. The absence of legal documents setting forth the rights and duties of the parties gives rise to no inferences in conflict with our findings. Here was a closely-knit family who loved and trusted one another and were acting in the shadow of the sudden death of their husband and father. Indeed, in such circumstances we would find it strange if they had executed a detailed written contract. The absence of a writing may make more difficult the duty of the Court to interpret their contract, but it does not relieve the Court of that duty; nor should it operate to thwart the good-faith intention of the parties.

Fourth, the Government contends that had Mrs. Fellows reserved an interest in the business, that fact would have been mentioned in the partnership agreement and later in the articles of incorporation. We cannot agree. The contract by which Mrs. Fellows reserved an interest in the business was entered into prior to the formation of both the partnership and the corporation. It follows that at the time the partnership was formed, and later, at the time the corporation was formed, the sons did not own 100% of the business and therefore could not deal with 100% of the business. Mrs. Fellows reserved an interest in the business, and such interest could not have been taken away from her by the acts of her sons in forming a partnership and in forming a corporation. Moreover, the parties undoubtedly considered it unnecessary to incorporate their agreement into either the partnership agreement or the articles of incorporation because of the close family relationship.

The Government also comments on the label under which Mrs. Fellows' 5% of the gross earnings was carried on the books of the business—"Commissions Paid"—and the categories under which it deducted such 5% on its income tax returns—"Commissions Paid" and "Salaries and Wages." The Government contends that these procedures constitute admissions that the receipts in controversy were income to the business. However, bookkeeping procedures cannot alter legal relationships. The accountant who set up the books of the business and prepared its tax returns testified that the word "Commissions" was used in order to conform to the long-standing terminology employed in the remainder of the Fellows bookkeeping accounts, and that the word "Commissions" actually referred to "earnings" or "profits."

Finally, the Government argues that the commingling by the Fellows corporation of all funds in one bank account resulted in the corporation having the beneficial use of the 5% which the taxpayers claim had been reserved to Mrs. Fellows. This argument simply does not square with the facts. The money was always available for Mrs. Fellows to withdraw, and there is no showing that any part of it was ever appropriated to the benefit of the corporation. The corporation held the funds as trustee for Mrs. Fellows.

The Government cites Van Meter v. Commissioner of Internal Revenue, supra. There, a corporation had assigned to certain individuals income to which it was rightfully entitled, and the corporation was held to have received taxable income despite the assignment. But the situation involved in that case was an assignment of income, not a reservation of the right to receive income. And, in the Van Meter opinion, the Eighth Circuit Court of Appeals made it clear that it did not intend for

that decision to apply to the situation with which we are now concerned. The Court said:

"If there exists á legal relationship of the earner to others which results in the earnings (in whole or in part) being for the benefit of others than the actual earner, the statutes do not attempt to tax the earner for such income as he was not earning in his own right * * *." [61 F.2d 819.]

Thus, the Court specifically distinguished the situation with which we are here presented.

We believe the cases of Bettendorf v. Commissioner of Internal Revenue, supra, and Central Life Assur. Soc. Mut. v. Commissioner of Internal Revenue, supra, are controlling on the issue before us. In Bettendorf, the petitioner was given certain shares of stock by his mother, under a contract by the terms of which he was obligated to pay to her all the income from the stock during her lifetime. That income was held not to be taxable income to the petitioner. Judge Gardner, speaking for the Court, said:

"The income was therefore at no time that of the petitioner, because by the very contract under which he held the legal title he was bound to account to the donor for the income. * * *

"We should regard the substance rather than the form. The simple fact appears to be that the petitioner was, so far as the income from these securities was concerned, a trustee, a fiduciary, and not a beneficiary. The purpose of the income tax law was to tax incomes actually and substantially derived, rather than such as might be constructively received. We must assume that it was not the purpose of the act to penalize an individual because he might be the innocent agency by or through whom a substantial income was derived for someone else. The government will not resort to sharp practice, nor invoke technical construction or fiction, which will manifestly thwart the good-faith intention of its taxpayers, for the purpose of visiting a tax burden upon one who in fact did not, except by construction, derive any beneficial income from the transaction. The income which petitioner received from these securities was not the income with which one pays debts." [49 F.2d 175.]

Central Life Assur. Soc. Mut., supra, involved two insurance corporations, one of which—the petitioner—was organized to take over the business of the other. Under the terms of the contract transferring the assets and liabilities of the original corporation to the petitioner, the petitioner was bound to pay to the stockholders of the original corporation all earnings from all non-participating policies then in force, for a period of 22 years. Such income was held not to be taxable to the petitioner. The Court said:

"While, for the purposes of convenience and certainty in collection of such taxes, it is sometimes provided that those who collect income for others shall pay therefrom the taxes thereon, yet a cardinal purpose of the income tax laws is to tax the income to the person who has the right or beneficial interest therein, and not to throw the burden upon a mere collector or conduit through whom or which the income passes." [51 F.2d 941.]

Here, as in Bettendorf and Central Life Assur. Soc. Mut., the money on which the Government seeks to impose income tax was not income to the corporation nor, as constructive dividends, to its stockholders.

It was agreed between the parties in these cases that if the plaintiffs prevail on all or any part of the issues, the correct amount of the tax (refunds) should be computed by the parties and reported to the Court, and if they are unable to agree, jurisdiction is retained by the Court to make final determination.

Counsel for plaintiffs will prepare and submit to the Court in each of these five cases Findings of Fact, Conclusions of Law and Judgment, in accordance with this memorandum decision. In the case of Max J. Fellows and Edith Fellows, plaintiffs, v. W. C. Welsh, District Director of Internal Revenue, defendant, Civil No. 1264 S.D., the judgment should contain the following: "Further, the Court hereby certifies that in performing his official duties involved herein, the defendant had probable cause."