OLIN BRYANT AND VANELL BRYANT, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5931-65, 6530-65—6537-65, 6600-65.   Filed September 30, 1966.

---

[1] Proceedings of the following petitioners are consolidated herewith : Bill W. Abell and Charlotte Abell, docket No. 6530-65; J. P. Beck and Kitty Lee Beck, docket No. 6531-65; Earl C. Abell and Neva Abell, docket No. 6532-65; J. B. Prewitt and Katherine Prewitt, docket No. 6533-65; Roy R. Abell, Jr., and Billy Mary Abell, docket No. 6534-65; Claude M. Adams and Artie Agnes Adams, docket No. 6535-65; Gerald Collier and Barbara Collier, docket No. 6536-65; Olin Bryant and Vanell Bryant, docket No. 6537-65; and Vance Cypert and Annie Cypert, docket No. 6600-65.

*Edward R. Smith* and *William Norton Baker*, for the petitioners.
*Sidney B. Williams* and *Harold L. Cook*, for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in the income taxes of petitioners:

| Name | Docket No. | Taxable year | Deficiency |
|------|-----------|-------------|-----------|
| Olin Bryant and Vanell Bryant | 5931–65 | Apr. 30, 1962 | $1,872.00 |
| Bill W. Abell and Charlotte Abell | 6530–65 | 1963 | 8,170.86 |
| J. P. Beck and Kitty Lee Beck | 6531–65 | 1962 | 43.72 |
| J. P. Beck and Kitty Lee Beck | 6531–65 | 1963 | 12,729.67 |
| Earl C. Abell and Neva Abell | 6532–65 | 1963 | 8,149.28 |
| J. B. Prewitt and Katherine Prewitt | 6533–65 | 1963 | 10,194.28 |
| Roy R. Abell, Jr., and Billy Mary Abell | 6534–65 | 1963 | 10,708.59 |
| Claude M. Adams and Artie Agnes Adams | 6535–65 | 1963 | 10,140.70 |
| Gerald Collier and Barbara Collier | 6536–65 | 1963 | 7,774.01 |
| Olin Bryant and Vanell Bryant | 6537–65 | Apr. 30, 1963 | 2,676.79 |
| Vance Cypert and Annie Cypert | 6600–65 | 1963 | 9,810.27 |

Some issues raised by the pleadings have been settled by the parties and will be given effect in the Rule 50 computations. Two issues are presented for decision:

(1) Whether the amount of $37,399.15 paid in 1963 to the Lubbock National Bank, as trustee, pursuant to production payment provisions in a warranty deed and conveyance, constituted part of the purchase price paid by petitioners for the Coyanosa Farms and must be included in their taxable income for such year.

(2) Whether the $50,000 limitation on investment credit under section 48(c)(2), I.R.C. 1954, for used section 38 property applies

to all petitioners as a "partnership" group, thus limiting each member to his proportionate share of $50,000, or whether each member of the group is entitled to a $50,000 credit since petitioners filed an election not to be treated as a partnership for the purposes of subchapter K.

Most of the facts have been stipulated by the parties. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference and are adopted as our findings.

The petitioners in each of these proceedings filed their joint Federal income tax returns for the years here involved with the district director of internal revenue at Dallas, Tex. Bill and Charlotte Abell and Olin and Vanell Bryant live in Lubbock, Tex. The remaining petitioners reside in Ralls, Tex. The petitioners use the calendar year for reporting income except the Bryants who use a fiscal year ending April 30. Since the wives are parties here only because they filed joint Federal income tax returns with their husbands, only their husbands will hereafter be referred to as petitioners.

On March 2, 1963, petitioners and Dallas Smith[2] (hereafter called Buyers) entered into a contract with C. E. Davis for the purchase of certain farmlands, leasehold interests, and the equipment and supplies used to operate them (hereafter collectively referred to as Coyanosa Farms). The purchase price stated in the agreement was $925,500, reduced by liens and encumbrances totaling $362,500, plus interest to which the Buyers were subject. In addition, the contract provided that the seller reserved a so-called production payment described in the following terms:

Provided, however, there is excepted, by Seller, from this conveyance and expressly reserved unto Seller and his heirs, representatives, successors and assigns, as a limited agricultural produce, livestock, poultry, and other surface or underground water use payment, herein elsewhere referred to as "production payment," an undivided one-tenth (1/10) of all the agricultural crops produced on, an undivided one-tenth (1/10) of all lease rental for livestock or poultry grazed, pastured or kept on * * * and an undivided one-tenth (1/10) of the gross proceeds from any other surface or underground water use of all lands described in Paragraphs 1 and 3 that accrue or are produced, in whole or in part, after the effective date of this conveyance, * * * free of all development, operation, production and other costs whatsoever, until out of the proceeds of the sale of such agricultural crops, the lease rental for such livestock and poultry, and the gross proceeds from such other surface or underground water use accruing or produced after the effective date of this conveyance to such one-tenth interest, Seller, his heirs, successors, representatives and assigns, shall have received, over and above all severance, gross production or other taxes, if any (other than taxes measured by net income), * * * the aggregate of the following:

(h) the full net sum of $250,000 in cash, plus

---

[2] Smith resides in another internal revenue district and his tax return was not audited in time to join him as a party in this proceeding.

(i) an additional amount equal to all ad valorem taxes assessed against or payable with respect to the production payment herein reserved by Seller that are paid by Seller, should Buyers fail to pay such taxes as required hereunder.

(j) an amount equal to interest from the date of closing hereof on the unliquidated balance of the sum specified in (h), and from the respective dates of outlay on the amount, if any, of (i) above, at the rate of seven per cent (7%) per annum simple interest not compounded.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Upon the aggregate sums and amounts specified in (h), (i) and (j) being paid to and received by Seller, all rights, titles and interests reserved to Seller under the above-described production payment shall terminate, and thereupon the one-tenth interest so reserved shall become vested in Buyers, their representatives, successors and assigns, free and clear of the exceptions and reservations pertaining to such production payment, and to evidence the fact, Seller, his heirs, representatives, successors and assigns, will at any time and from time to time execute and deliver, on request, all necessary and appropriate releases.

11. The production payment is a wholly separate and distinct property interest which may be sold, mortgaged, encumbered or otherwise disposed of by Seller, or his transferees. Buyers shall never be personally liable for payment of the production payment, or any part thereof, and Seller, his heirs, representatives, successors and assigns shall look exclusively to the crops, rentals and proceeds herein reserved for the discharge of such production payment, but Buyers shall be personally liable for such damages as Seller may sustain by reason of any failure of Buyers to keep or perform all of the covenants and obligations herein provided to be kept or performed by Buyers.

Buyers agree that until such time as the production payment has been liquidated and discharged:

(a) Buyers will cause the lands described in Paragraphs 1 and 3 to be developed and continuously operated for the production of crops, livestock and poultry rentals and such other proceeds in a good and farmerlike manner and in accordance with all applicable laws and regulations and approved practices in the industry, and cause to be paid all costs and expenses incurred after closing hereof in developing, operating, equipping and maintaining such lands;

(b) Buyers will not surrender, abandon or release, in whole or in part, any lease referred to in Paragraphs 3 or 4 so long as the gross income and proceeds from such lease or portion thereof attributable to the Buyers' working interest was sufficient to pay that part of Buyers' actual out-of-pocket expenses of operating and maintaining such lease or portion thereof, unless Buyers first give thirty (30) days' written notice to Seller of intention, and upon receipt by Buyers of written request from Seller within such thirty-day period, Buyers shall execute and deliver to Seller or his nominee a reassignment of interest in such lease or portion thereof which Buyers desire to surrender, abandon or release, in which event Buyers shall be relieved from all further obligations with respect to the acreage to [be] reassigned, but the amount of the production payment and the interests out of which it is dischargeable shall not be affected or impaired;

(c) Buyers will render and pay all ad valorem taxes or other taxes and assessments whatsoever levied or assessed upon all properties described in Paragraphs 1, 3, 4 and 5 (including the interest out of which the production payment is dischargeable) which become due and payable after the date of closing hereof; provided, however, that such obligation of Buyers shall not be a personal obligation against them individually; and provided, further, that if Seller pays any of such taxes which are applicable to production payment, the amount of taxes so paid

shall be added to and become a part of the production payment to which such taxes are applicable.

(d) Buyers will keep true and correct books and records showing the amount of crops produced and sold, and the amount of lease rentals and other proceeds received upon which such production payment is to be calculated, and the holders of such production payment shall at all reasonable times have the right to examine, audit and make excerpts from any and all books and records of Buyers appertaining to all properties herein described and the production, rentals and proceeds therefrom, and Buyers agree to do everything reasonably necessary or appropriate to admit of and facilitate the exercise of such right;

(e) Buyers will, from time to time at reasonable intervals, deliver to Seller, upon request, such hydrological, engineering and other scientific data and reports regarding the properties described in Paragraphs 1, 3, 4 and 5 normally accumulated in the regular course of operations;

(f) Buyers will permit Seller and the accredited agents or nominees, or the holders of such production payment, at all times to go upon, inspect and remain on the lands described in Paragraphs 1, 3, 4 and 5;

(g) Buyers will deliver to Seller on or before the 31st day of January of each year a report in a form approved by Seller, setting forth the results of operations of the lands described in Paragraphs 1, 3, 4 and 5 during the preceding calendar year.

The seller (Davis) was only interested in receiving $1,175,500 for the Coyanosa Farms, and the "production payment" outlined above was included in the contract at the request of the Buyers, with the written understanding that Davis would be unhindered by it. With respect to the "production payment" the contract provided:

In the event a satisfactory purchaser (or purchasers) of the production payment cannot be found within a reasonable period hereafter, neither Seller nor Buyers shall be obligated to consummate this contract, and the provisions hereof shall be null and void, except Seller shall reimburse Buyers for any net costs borne by Buyers under the provisions of Paragraph 14 and Seller shall be entitled to retain the earnest money cash deposit described in Subparagraph 7(a). *The term "satisfactory purchaser," as used in the immediately preceding sentence shall mean a purchaser ready, willing and able to purchase such production payment on the closing date hereunder and to pay therefor in cash on date of closing the sum of $250,000.00.* [Emphasis supplied.]

At the time the buyers signed the March 2, 1963, contract with Davis, they had no prospective purchaser in mind for the production payment. When they failed to find such a purchaser during April 1963, their attorney negotiated with the Lubbock National Bank (hereafter called the bank) concerning its possible purchase of the production payment. The initial negotiations were conducted with Edward H. Elliott, vice president and trust officer of the bank. The buyers offered to establish trusts with the bank and contribute $100,000 to them, if the bank would furnish the balance of the purchase price of the production payment by loaning the trusts an additional $150,000. Elliott, as the proposed trustee of the trusts to be established by the buyers, discussed their proposal with the bank's principal lending officials, the

Commercial Loan Committee. They considered the past and anticipated performance of the lands involved in relation to that provision of the production payment which guaranteed them 10 percent of the gross production regardless of profit. The bank then approved the $150,000 loan without personal guarantees from the buyers. The terms of the loan required that repayment be made solely from the production of the land.

On April 24, 1963, the buyers fulfilled their part of the agreement. Each buyer and his wife created a trust of $10,000 for the benefit of their children. The bank was made trustee, and the instruments provided, among other things, that the trusts were irrevocable and would terminate at the expiration of 10 years and 6 months at which time the trust corpus would be distributed to the settlor or his representative. The income, if any, earned by the trust was to be accumulated for or distributed currently to the beneficiaries in the complete discretion of the trustee.

On April 29, 1963, C. E. Davis executed and delivered a warranty deed to the buyers with respect to Coyanosa Farms, and a document entitled "Conveyance of Production Payment" to the Lubbock National Bank, trustee. In return, Elliott, as trustee, issued a check to Davis drawn on the various trusts for $250,000. The trusts on this same day borrowed $150,000 from the bank. Both the warranty deed and the "Conveyance of Production Payment" were recorded in the deed records of the counties in which the lands were situated.

All amounts due under the production payment have been promptly remitted to Lubbock National Bank, trustee. All such receipts, in excess of nominal operating expenses, have been immediately disbursed by the bank as trustee to its commercial loan department, in payment of the then accrued interest and principal of the note.

During the calendar year 1963 a total of $37,399.15 was paid to the Lubbock National Bank, trustee, pursuant to the production payment provisions of the contract. The petitioners did not include any portion of that amount in gross income reported in their tax returns for that year. Instead, these amounts were reported by Lubbock National Bank, trustee, as income of the trusts.

Respondent determined that the gross income of the petitioners (except those in docket Nos. 5931–65 and 6537–65) should be increased by their prorata share of the amounts paid to the bank as trustee, and so informed the petitioners in statutory notices of deficiencies with the following explanation:

It is determined that the total consideration for the Coyanosa Farms at the time of purchase was $1,175,500.00 instead of $925,500.00. The basis in the farms is increased by the difference of $250,000.00 purported to be a production payment reserved by the seller who sold the production payment to certain trusts established by you and other individuals. It is determined that one-tenth of the

amount of $37,399.15 paid into the trusts, or $3,739.92, from crops produced on the Coyanosa Farms constitutes income taxable to you in the taxable year ended December 31, 1963. Accordingly, your income is increased by that amount.

The buyers entered into an agreement dated March 1, 1963, with Dallas Smith styled "Operators Agreement" which provided that Dallas Smith would be in charge of operating Coyanosa Farms. The agreement provided, in part, as follows:

1. GENERAL DUTIES OF OPERATOR.—Operator shall have, subject to the terms, provisions and limitations hereinafter expressed, exclusive charge, control and supervision of all operations of every kind to be conducted on the Joint Property for the production of farm and ranch products, as well as the payment of all expenditures, lease rentals and taxes which may be or become due or payable in connection with such operations.* * *

2. OWNERSHIP OF PRODUCTION AND CHARGES TO JOINT ACCOUNT.—All farm and ranch products raised and produced on the Joint Property and all improvements and equipment acquired or constructed by Operator for the benefit of the Joint Account shall be owned equally by the parties hereto.

All charges made to the Joint Account as provided herein shall be borne and all credits and returns shall be shared by the parties hereto in proportion to their respective interests in the property subject to this agreement.

\* \* \* \* \* \* \*

5. TAKING PRODUCTS IN KIND: MARKETING OF PRODUCTS.—Each Non-Operator shall have the right and privilege of receiving in kind and separately disposing of his portion of the farm and ranch products produced from the Joint Property. Such products shall be delivered to the Non-Operator involved if so requested by such Non-Operator or Operator shall deliver such products to any warehouse or elevator designated by such Non-Operator. Such Non-Operator shall bear any extra expense incurred by Operator in delivering in kind Non-Operator's portion of the products from the Joint Property.

Subject to the provisions of the preceding paragraph, Operator is given authority to market all farm and ranch products produced from the Joint Property and accruing to the parties hereto; and, upon the sale of same, the purchaser thereof shall pay to the respective parties hereto the proceeds of sale in proportion to each respective party's interest in the farm and ranch products produced; * * *

\* \* \* \* \* \* \*

7. Each Non-Operator shall have the following specific rights and privileges:

(a) Access to the Joint Property at all reasonable times to inspect the operations hereunder.

(b) The right to inspect and audit at all reasonable times the Operator's books, records and invoices pertaining to any matter of accounting arising hereunder.

(c) The right to participate in all litigation and all hearings before administrative bodies, including any agency of the Agricultural Department of the United States, affecting the Joint Property.

The buyers filed a partnership return for the calendar year 1963 in which an election was made under the provisions of section 761(a), I.R.C. 1954, to be excluded from the application of all of the provisions of subchapter K of the 1954 Code.

In his notices of deficiencies the respondent determined that each of the petitioners, in computing investment credit with respect to used Coyanosa Farms qualified assets, was limited to his proportionate share of the aggregate of $50,000 of used assets, thus treating the Buyers as a partnership for the purposes of section 48(c)(2).

OPINION

*Issue 1*

Petitioners contend that the amounts paid to the trusts under the production payment provisions in question are taxable to the trusts and not to them. They claim they never owned these amounts, never had any beneficial use of them, and acted merely as a conduit in passing the funds to the trusts. Respondent, on the other hand, argues that the transactions entered into by petitioners were a sophisticated attempt to assign anticipated future agricultural income as payment for a substantial part of the purchase price of Coyanosa Farms.

Petitioners carefully structured their transactions in the manner of the classic ABC transaction popularized by the oil and gas industry.[3] They contend that the long line of production payment cases[4] is authority for the ABC transaction in the oil and gas industry and is equally valid authority for their ABC acquisition of Coyanosa Farms. Respondent recognizes the form in which petitioners have couched their transaction, but maintains that the same result does not obtain outside the depletable mineral area. His position is that the economic realities and substance of the transactions dictate that the production payment was petitioners' income because they owned the property from which the income was produced, such income inured to their

[3] A production payment (a stipulated percentage of annual gross production paid in kind, or cash, and secured only by such production, until a predetermined amount has been paid the vendor by the vendee) retained by A (the seller) from his sale of the lease or fee to B (the buyer) which may be sold separately, or at the same time, to C (a third party) for capital gains. "If the sale of the oil payment divests the seller of all interest in the property, capital gain will be recognized. Thus A, owning an oil lease, may sell the working interest to B, retaining an oil payment, and then sell the oil payment to C. A has divested himself of the entire lease and gets capital gain on both sales." Fiske, Federal Taxation of Oil and Gas Transactions 131 (1958).

The many combinations and permutations of the ABC transaction, and the varying tax results attainable, have produced a large body of literature. See Appleman, "The ABC Deal," 11th Oil & Gas Inst. 519 *et seq.* (1960). See also Hambrick, "Another Look at Some Oil Problems—Percentage Depletion and the ABC Transaction," 34 Geo. Wash. L. Rev. 1 (1965) ; Spencer and Rowen, "The ABC Transaction," P–H Oil and Gas Taxes sec. 2011 (Mar. 24, 1965) ; Galvin, "ABC Transactions and Production Payments," P–H Oil and Gas Taxes, sec. 2028.4(7) (Oct. 23, 1963) ; Lyon and Eustice "Assignment of Income : Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 295 (1962) ; "The Case for ABC," XI–1 Oil & Gas Tax Q. 1 (1961) ; Wilkinson, Jr., "ABC—From A to Z," 38 Tex. L. Rev. 673 (1960) ; and Miller, Oil and Gas Federal Income Taxation (4th ed. 1966).

[4] *Burnet* v. *Harmel,* 287 U.S. 103 (1932) : *Palmer* v. *Bender,* 287 U.S. 551 (1933) ; *Thomas* v. *Perkins,* 301 U.S. 655 (1937) ; *Anderson* v. *Helvering,* 310 U.S. 404 (1940) ; *Kirby Petroleum Co.* v. *Commissioner,* 326 U.S. 599 (1946) ; *Burton-Sutton Oil Co.,* 328 U.S. 25 (1946) ; *Commissioner* v. *Southwest Exploration Co.,* 350 U.S. 308 (1956).

benefit, and the production payment constituted nothing more than an encumbrance or security device.

Petitioners rely principally on the rationale of *Thomas* v. *Perkins*, 301 U.S. 655 (1937). In that case the assignor of certain oil and gas leases sold the leases for a small amount of cash in hand, plus $395,000 to be paid out of one-quarter of all oil produced from the land until the full sum was paid. The payment was to be made out of the oil only, if and when produced, was not a personal obligation of the assignee, and was to bear no part of the costs of development or production. The assignee did not include in his gross income the amounts of the oil payments made to the assignors. The Commissioner determined that the assignors had sold their total interest in the property, included the oil payments in the gross income of the assignee, and allowed him depletion with respect to the payments.[5] The Supreme Court held that the assignors had retained a sufficient "interest" in the oil deposit to be entitled to depletion with respect to the oil sold out of their share and thus the income from their share was not chargeable to the assignee.

The Supreme Court depended substantially on its opinion in *Palmer* v. *Bender*, 287 U.S. 551 (1933), where it allowed a lessor to take depletion deductions with respect to reserved royalty payments, bonus payments, and oil payments received from the lessee.

In *Perkins* the Court quoted the following language from *Palmer* which has become the touchstone of subsequent cases (287 U.S. at 557–558):

The language of the statute [section 214(a)(10) of the Revenue Act of 1921 (which provided for depletion allowances, among other things)] is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital.

\*     \*     \*     \*     \*     \*     \*

Similarly, the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if by virtue of the leasing transaction he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production. Thus we have recently held that the lessor is entitled to a depletion allowance on bonus and royalties, although by the local law ownership of the minerals in place passed from the lessor upon the execution of the lease. \* \* \*

Thus throughout their changing relationships with respect to the properties, *the oil in the ground was a reservoir of capital investment of the several parties, all*

---

[5] It was proved at trial that the long-standing practice of the Commissioner was not to require the operator of an oil and gas lease to include in his income royalties payable in kind to lessors. However, where they were payable in cash, the operator had to take all of the proceeds into income and take an offsetting deduction for royalties paid. "Unlike ordinary rights to rent or royalty, oil payment rights represent share rights in only a portion of the oil or mineral content of the land. When the stipulated payments are made, the payee's interest in oil or mineral expires." G.C.M. 22730, 1941–1 C.B. 214.

*of whom* * * * *were entitled to share in the oil produced.* * * * [Emphasis supplied.]

On the basis of the above, and in considering *Helvering* v. *Twin Bell Syndicate*, 293 U.S. 312 (1934), which denied the assignee of an oil lease the right to compute depletion on the basis of gross proceeds of all oil produced where he was obligated to pay royalties totaling one-fourth of such oil, the Supreme Court concluded that Perkins did not have to include oil payments to his assignors in his gross income. These cases, and their successors, established the right of a lessor (or vendor) to sell oil and gas leases (or the entire fee in the property) to another while reserving oil payments excludable from the assignee's gross income and ordinary depletable income in the hands of the assignor. It is claimed that such cases are also authority for the ABC oil and gas transaction which merely includes one more step—the sale by the assignor (A) of the oil production payment, reserved by him from his sale of the lease or fee to the operator (B), to a third party (C). The third party realizes ordinary depletable income upon receipt of amounts with respect to the production payment, while the assignor realizes capital gain upon his sale of the entire production payment.

This line of cases has been restricted to the depletable mineral area.[6] The subject of the so-called production payment involved here is not depletable. Consequently, we must view this attempt to extend the rationale of *Palmer* and *Perkins* to nondepletable interests[7] in the light of the Supreme Court's continued restriction of that doctrine. See *Commissioner* v. *Brown*, 380 U.S. 563, 575–576 (1965);

---

[6] However, in *Commissioner* v. *Brown*, 380 U.S. 563 (1965), the Government did argue this theory in an attempt to show that a complete sale had not been made. The Supreme Court, after recognizing the peculiar character of the business of extracting natural resources, answered that *"Thomas* v. *Perkins,* does not have unlimited sweep." 380 U.S. at 575–576.

[7] See Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," *supra* fn. 3. The authors, at pp. 343–344, in discussing the applicability of the ABC arrangement to a real estate transaction where A retains certain rental rights and sells them to C, a third party, said: "But whether the buyer [B] could exclude the rental retained by the seller [A] from his income, it is doubtful at best whether the Service would ever consent to such an extension of this aspect of the ABC treatment."

See also the recent remarks by Senator Gore of Tennessee where, in resisting the issuance of a favorable revenue ruling involving an ABC acquisition of depletable mineral interests other than oil and gas, he referred to the "notorious ABC scheme" which is "a sophisticated tax gimmick." See 112 Cong. Rec. 12080–12083 (June 8, 1966), 18146–18147 (Aug. 11, 1966), 18685 (Aug. 16, 1966). "Heretofore, the ABC transaction has been largely confined to oil and gas, which are, of course, favored industries. But I see no reason to compound inequity by allowing the ABC transaction to spread to other industries. * * * The ABC transaction is a tax dodge, pure and simple. Taxation is the principal reason for setting it up." 112 Cong. Rec. 12081 (June 8, 1966). See also S. 3719, 89th Cong., 2d Sess. (1966), introduced by Senator Gore and referred to the Senate Committee on Finance on Aug. 11, 1966, which would make the ABC transaction less profitable, especially outside of the oil and gas industry.

We simply point to this information as showing some resistance to the extension of the ABC doctrine, not only outside of the mining industry generally, but also outside of the oil and gas industry itself.

*Parsons* v. *Smith*, 359 U.S. 215, 222–226 (1959); *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 266–268 (1958); *Anderson* v. *Helvering*, 310 U.S. 404, 413 (1940); *Helvering* v. *Elbe Oil Land Development Co.*, 303 U.S. 372, 375–376 (1938).

Petitioners claim that, for the purposes of this case, the fact that they structured their transactions in the classic A (Davis) B (petitioners) C (bank trustee) fashion does not require a different result than would a *Perkins*-type AB transaction, viz, where the production payment is merely retained by the assignor. We agree. We are only interested in whether Davis retained the type of interest in the farms which would have prevented the "production payment" from being taxed to petitioners if there had been no third party involved. Of course, since neither Davis nor the trusts are before us, we do not have to consider the tax implications of our decision with respect to them. Likewise, we do not have to consider what effect, if any, the use of 10-year reversionary trusts has on the arrangement.

The crucial element in the *Palmer* and *Perkins* decisions was the reservation of the right to receive oil *in place*. The Supreme Court found this to be the retention of an economic interest in the oil so independent from the remainder as to be severable from it. For this reason, and not merely because the agreements involved expressly indicated this result, the subsequent extraction and sale of the oil (attributable to the production payment) produced no taxable income for the owners of the remainder interests. The petitioners argue that Davis retained such an independent, severable interest which he transferred to the Lubbock National Bank as trustee. We do not think so.

The term "economic interest" is a term of art which has obtained a special meaning in the tax laws concerning depletion. *Elm Development Co.* v. *Commissioner*, 315 F. 2d 488, 489 (1963). The courts originally had before them the language of section 214(a)(10) of the Revenue Act of 1921 (and similar provisions of later revenue acts) which provided a deduction for depletion "in the case of * * * oil and gas wells, * * * according to the peculiar conditions in each case" which, "in the case of leases" was to be "equitably apportioned between the lessor and lessee."[8] In construing this broad language, the Supreme Court coined the term "economic interest" to describe the quantum of rights a taxpayer would have to reserve to himself, upon the sale or lease of oil and gas properties, to claim depletion on oil payments made to him. The term means "any interest" acquired by investment "in oil in place" and secured "by any form of legal relationship" to which the taxpayer must look for a return of his capital. *Palmer* v. *Bender, supra* at 557.

---

[8] Substantially the same language is now contained in sec. 611, I.R.C. 1954.

The term "economic interest" had a tail-wagging-the-dog type of development. The Supreme Court, at the time of *Palmer*, had just decided that the lessor of an oil and gas well was entitled to a depletion allowance with respect to bonus and royalties received from a lessee. *Murphy Oil Co.* v. *Burnet*, 287 U.S. 299 (1932). The Court was also confronted with a statute which provided for equitable apportionment of depletion deductions between lessors and lessees. Perkins was the vendor of a lease who had, however, reserved "rental-type" oil payments. In view of the broad language of the statute involved, the Court felt it could not limit its benefits to only technical lessors and thus used the term "economic interest" as the type of retained interest that would permit the holder of an oil payment to take depletion deductions. Thus the decision in *Perkins* was required by logic. Since the oil payment owner was entitled to depletion with respect to the payment (because of his economic interest), and not the producer of the oil, then obviously the oil income was charged only to the oil payment owner. The Court said (301 U.S. at 663):

> As Hammonds and Bronson, the assignors in this case would be entitled to an allowance for depletion in respect of the oil sold out of their share,[4] the income from that interest is not chargeable to respondents, Perkins and wife. It follows that the Commissioner erred in including in their income the payments made by purchasers to assignors for their share of the oil. [Footnote omitted.]

The Supreme Court has consistently pointed out that Congress has recognized the "peculiar character" of the business of removing natural resources from the ground.[9] The business has been viewed as an income-producing operation rather than the conversion of a capital asset.[10] It has been held that leases are a method of exploiting oil-producing properties and that oil payments are income to the lessor in the nature of rent.[11] It has been reasoned that because lessors and other transferors of the right to exploit the land for oil may retain, through their control over exploitation of the land, valuable benefits arising from and solely dependent on the extraction of oil from the land, Congress has provided for equitable apportionment of the depletion allowance.[12]

From our analysis of the Supreme Court cases we believe that the "economic interest—production payment" principles are peculiarly

---

[9] *Commissioner* v. *Brown, supra* at 575–576 ; *Commissioner* v. *Southwest Exploration Co., supra* at 312–313 ; *Burton-Sutton Oil Co.* v. *Commissioner, supra* at 33 ; *Burnet* v. *Harmel, supra* at 106–108 ; *Stratton's Independence* v. *Howbert*, 231 U.S. 399, 413–414 (1913).

[10] *Commissioner* v. *Brown, supra* at 576 ; *Anderson* v. *Helvering, supra* at 407 ; *Burnet* v. *Harmel, supra; Stratton's Independence* v. *Howbert, supra* at 414–415.

[11] *Burton-Sutton Oil Co.* v. *Commissioner, supra* at 33 ; *Burnet* v. *Harmel, supra* at 107–108.

[12] *Burton-Sutton Oil Co.* v. *Commissioner, supra* at 33–34 ; *Palmer* v. *Bender, supra* at 556 ; *Lynch* v. *Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925).

**860**

creatures of the depletable mineral area. If it were not for the economic interest theory, the Commissioner would have undoubtedly been successful years ago in his persistent attempts to tax oil payments to the owner of the property producing the income. Hence we cannot agree with the petitioners that the courts have never purported to limit the application of these principles to minerals and that there is no apparent reason to so limit them.

Recently we considered the applicability of the *Perkins* doctrine to the sale of an insurance business. See *Larry D. Hibler*, 46 T.C. 663 (1966). In that case the taxpayer purchased all the assets of a fire and casualty insurance agency, including equipment, records, and expiration lists. In addition to a cash payment of $20,000, it was provided that the taxpayer would pay to the seller 50 percent of the commission income received from the renewal business, reflected on the seller's books at the time of sale, until $70,000 was paid. The taxpayer included the amounts he paid over in income and then deducted the same amounts as business expenses. The taxpayer claimed that the amounts were excludable from his gross income and deductible. In disagreeing with the taxpayer on both grounds, we found that there had been a mere assignment of income and that the seller's retained interest was in the nature of a security or encumbrance device. In answer to the taxpayer's analogy with respect to *Perkins*, we said (46 T.C. at 670) :

> Cases like *Thomas* v. *Perkins*, 301 U.S. 655 (1937) and *United States* v. *Witte*, 306 F. 2d 81 (C.A. 5, 1962), involving reserved economic interests in oil, gas, sand or gravel, are disparate and reliance on them is misplaced. They deal with depletable natural resources. They do not have "unlimited sweep" and their applicability has been severely limited by the Supreme Court. See *Commissioner* v. *Brown*, 380 U.S. 563, 575–576 (1965), and *Anderson* v. *Helvering*, 310 U.S. 404, 413 (1940). Therefore, we are unwilling to extend their rationale to cover an attempted reservation of a specified amount of future income earned by this petitioner in selling fire and casualty insurance renewals.

We are likewise unwilling to extend the *Perkins* rationale to the sale of farms with the attempted reservation of a production payment by the seller.[13]

There is still another reason for not extending *Perkins* to the facts here. Missing in this case is the "reservoir of capital investment" that was present in *Palmer* and *Perkins*. Farm produce is far different from oil and gas deposits which are completely in place when sold.

---

[13] See the concurring opinion in *Moberg* v. *Commissioner*, 354 F. 2d 757 (C.A. 5, 1966), where circuit Judge Brown said :

"I concur in the result and in most of what the Court says. I have, however, two specific reactions which I am unable to submerge.

"The first is the dubious reliance on that very peculiar 'economic interest' concept as to the tax incidence of oil and gas transactions. * * * We have enough problems in confining this to depletable resources without bringing it in to offer a wholly new explanation * * *."

Such property is subject to fragmentation and will be present, in decreasing amounts, for some years. But unlike oil and gas reserves, farm crops are harvested at periodic intervals and then replenished by new planting. We fail to see how the petitioners can have a reserved interest in farm produce to be planted and harvested in the future.

Petitioners cite *McCulley Ashlock*, 18 T.C. 405 (1952), as an example of a situation where a vendee was not held taxable on certain rental payments retained by the vendor for a period of years in diminution of the sales price. However, in that case the vendor had expressly reserved the right to possession and control during the period he was to receive the rents and also had a number of duties and obligations with respect to the realty involved. Cf. *Larry D. Hibler*, *supra*, and *Alstores Realty Corp.*, 46 T.C. 363 (1966).

Petitioners also cite a number of cases in which they claim that the *Perkins* principle, at least in theory if not name, was applied in non-mineral areas. See *Willard S. Heminway*, 44 T.C. 96 (1965); *Ruth W. Collins*, 14 T.C. 301 (1950); *Fellows Sales Co. v. United States*, 200 F. Supp. 347 (D.S.D. 1961); *Mark D. Eagleton*, 35 B.T.A. 551 (1937), affirmed on other issues 97 F. 2d 62 (C.A. 8, 1938); *Central Life Assur. Soc. Mut. v. Commissioner*, 51 F. 2d 939 (C.A. 8, 1931); *Bettendorf v. Commissioner*, 49 F. 2d 173 (C.A. 8, 1931); and *Shellabarger v. Commissioner*, 38 F. 2d 566 (C.A. 7, 1930). We think all of these cases are either factually or legally distinguishable from the instant case. Moreover, there is one factor in every one of the above-cited cases which makes them inapposite. Each involved payments substantially for the life of a party or for the life of the property. Hence each is more analogous to a royalty payment than a production payment which lasts only until a specific sum is paid.

The economic realities here are clear. The production payment was arranged by petitioners as a means for paying a part of the $1,175,500 purchase price from future farm income. Cf. *Vermont Transit Co.*, 19 T.C. 1040 (1953), affd. 218 F. 2d 468 (C.A. 2, 1955), certiorari denied 349 U.S. 945. In our opinion the "production payment" did not create or constitute a property interest for its holder, but in substance was an encumbrance upon the farms to be satisfied out of payments measured by future farm income. To be sure, the benefits resulting from the income payments inured to petitioners since the balance due on the encumbrance against their property was proportionately decreased.

It is our view that petitioners, as purchasers and owners of Coyanosa Farms, are taxable upon the gross proceeds from farm production, notwithstanding the arrangement to pay over part of the proceeds to the trusts. See *Horst v. Helvering*, 311 U.S. 112 (1940);

*Lucas* v. *Earl*, 281 U.S. 111 (1930); and *Sowell* v. *Commissioner*, 302 F. 2d 177, 181 (C.A. 5, 1962). Consequently, we sustain the respondent on this issue.

## Issue 2

Each petitioner computed his investment credit for the taxable year 1963 upon an aggregate $50,000 of used Coyanosa Farms assets. Respondent determined, however, that each petitioner is limited to his proportionate share of $50, 000. At issue is whether an election under section 761(a),[14] as to all of subchapter K, avoids partnership treatment for the purpose of sections 38 and 48(c)(2)(D).[15] Petitioners contend that their election under section 761(a) not to be treated as a partnership for the purposes of subchapter K extends to the investment credit provisions of sections 38 and 48 so that the limitation of section 48(c)(2)(D) is not applicable to them.

The issue has not been previously considered by this Court or, to our knowledge, by any other court. But the Commissioner has answered the question in the negative.[16]

---

[14] SEC. 761. TERMS DEFINED.

(a) PARTNERSHIP.—For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. Under regulations the Secretary or his delegate may, at the election of all the members of an unincorporated organization, exclude such organization from the application of all or part of this subchapter, if it is availed of—

(1) for investment purposes only and not for the active conduct of a business, or

(2) for the joint production, extraction, or use of property, but not for the purpose of selling services or property produced or extracted,

if the income of the members of the organization may be adequately determined without the computation of partnership taxable income.

[15] This section limits the amount of property against which the investment credit of sec. 38 can be taken.

SEC. 48. DEFINITIONS; SPECIAL RULES.

(c) USED SECTION 38 PROPERTY.—

\*          \*          \*          \*          \*          \*          \*

(2) DOLLAR LIMITATION.—

(A) IN GENERAL.—The cost of used section 38 property taken into account under section 46(c)(1)(B) for any taxable year shall not exceed $50,000. If such cost exceeds $50,000, the taxpayer shall select (at such time and in such manner as the Secretary or his delegate shall by regulations prescribe) the items to be taken into account, but only to the extent of an aggregate cost of $50,000. Such a selection, once made, may be changed only in the manner, and to the extent, provided by such regulations.

\*          \*          \*          \*          \*          \*          \*

(D) PARTNERSHIPS.—In the case of a partnership, the limitation contained in subparagraph (A) shall apply with respect to the partnership and with respect to each partner.

[16] See Rev. Rul. 65–118, 1965–1 C.B. 30, which reads, in pertinent part, as follows:

A, B, C, and D, each of whom had a one-fourth interest in a joint venture consisting of an oil lease, properly elected, pursuant to section 761 of the Code, not to be treated as a partnership for purposes of subchapter K, chapter 1, subtitle A of the Code.

In 1964, A, B, C, and D purchased, for use by the venture, used property which cost each of them in excess of 50,000 dollars. On their income tax returns, filed for the taxable year ended during 1964, each of them used the individual 50,000 dollar limitation set forth

We agree with the respondent that, in computing investment credit, the petitioners should be limited to their prorata share of $50,000 in used Coyanosa Farms assets. We disagree with petitioners that such a position is out of harmony with congressional intent and "the unity of the Code."

First, the election provided for in section 761(a) is restricted by its own tight and explicit terms to subchapter K and it does not otherwise affect the treatment or character of the business relationship of petitioners.

Second, it is clear that the petitioners did not acquire and operate the farms as unrelated individuals, but as members of a group specifically formed for that purpose. They created a "partnership" within the meaning of that term as defined in section 761(a) and section 7701(a)(2).[17] Petitioners do not dispute this or the equally obvious fact that a partnership and the partners individually are allowed a maximum of $50,000 *for partnership assets*. See H. Rept. No. 1447, 87th Cong., 2d Sess., p. 11 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., p. 160 (1962). The term "partnership" is defined in section 761(a) "for the purposes of this subtitle." Thus the same meaning must be given to the term "partnership" in sections 761 and 48 since both are part of subtitle A of the Code.

in section 48(c)(2)(A) of the Code in determining their investment tax credit with respect to the property purchased for the joint venture.

Section 7701(a)(2) of the Code provides, in pertinent part, that the term "partnership" as used in the Code includes a joint venture.

Section 761 of the Code permits the members of an unincorporated organization such as the joint venture in the instant case, to elect not to be treated as a partnership for purposes of subchapter K, chapter 1, subtitle A of the Code.

Section 48(c)(2)(A) of the Code provides, in effect, that the cost of used section 38 property taken into account in computing the investment credit for any taxable year shall not exceed 50,000 dollars. Section 48(c)(2)(D) of the Code makes this limitation applicable to partnerships.

The election permitted under section 761 of the Code, under which certain types of joint ventures may elect not to be treated as partnerships as that term is defined in section 7701 of the Code, exists only for purposes of subchapter K, chapter 1, subtitle A of the Code. Consequently, such a joint venture is still a partnership for purposes of those sections of the Code, such as sections 38 and 48, which do not fall within subchapter K.

Accordingly, it is held that the joint venture in the instant case is a partnership for purposes of determining the amount of its qualified investment in used section 38 property which may be taken into account in computing the investment credit, even though it has elected under section 761 of the Code not to be treated as a partnership. From this it follows that, with respect to the joint venture's used section 38 property, each joint venturer is not entitled to take more than his allocable portion of the joint venture's 50,000 dollar limitation on such property in computing his investment credit.

[17] SEC. 7701. DEFINITIONS.

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

* * * * * *

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

Third, the Commissioner is empowered by section 761(a) to exclude a partnership "from the application of all or a part of *this subchapter.*" Such exclusion from partnership treatment is expressly limited by the plain language of the statute. The Commissioner does not have the authority to redefine what a partnership is; he is only empowered to exclude partners from being treated as such under one specific subchapter. If we were to accept the argument advanced by petitioners, we would necessarily extend the Commissioner's power of exclusion to other sections of the Code outside subchapter K. This we are unwilling to do because it would not be within the spirit or intendment of the statute as enacted by Congress. In our opinion sections 761(a) and 48(c)(2)(D) are not interdependent. When Congress has subtitlized, subchapterized, and sectionized its treatment of a many threaded statutory pattern like the complex Internal Revenue Code, its clear words seem to us a safe guide to meaning. The election under section 761(a) does not operate to change the nature of the entity. A partnership remains a partnership; the exclusion simply prevents the application of subchapter K. The partnership remains intact and other sections of the Code are applicable as if no exclusion existed. Accordingly, we hold for the respondent on this issue.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*